# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

ROBIN DIMEGLIO,

        Plaintiff,

v.                                        ACTION NO. 2:13cv413

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia.

Plaintiff Robin DiMeglio ("Mr. DiMeglio" or "Plaintiff") brought this action under 42 U.S.C. §§ 405(g) and 42 U.S.C. § 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") for the period from August 25, 2005 through January 1, 2009, pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act. The undersigned recommends that the decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL BACKGROUND

Plaintiff protectively applied for DIB and SSI on November 26, 2006, alleging disability

since August 25, 2005, caused by "Lymes Disease." R. 176-79, 191, 526-30.[1] Plaintiff's applications were denied. R. 531-34. Plaintiff requested a hearing by an Administrative Law Judge (ALJ), which occurred on March 24, 2009. R. 40-68. Plaintiff, acting pro se, testified before the ALJ, along with a vocational expert. R. 540-89.

On May 11, 2009, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. R. 48-61. Plaintiff appealed that decision to the Appeals Council, which remanded Plaintiff's case for a supplemental hearing. R. 136-148. A second hearing was held before the same ALJ on November 22, 2011, during which the Plaintiff and a vocational expert testified. R. 590-623. As a result of this hearing, the ALJ found that Plaintiff was disabled as of January 2, 2009, and awarded benefits as of that date. R. 31-43. The Appeals Council denied Plaintiff's second request for administrative review of the ALJ's decision denying benefits for the period from the alleged onset date of August 25, 2005 through January 1, 2009. R. 5-6. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481 (2012).

Plaintiff timely filed this action for judicial review pursuant to 42 U.S.C. § 405(g). On February 7, 2014, Plaintiff filed a series of exhibits that the Court has construed to be a motion for summary judgment. ECF No. 12. On April 14, 2014, Defendant filed a cross-motion for summary judgment. ECF No. 15. As neither counsel in this case has indicated special circumstances requiring oral argument in this matter, the case is deemed submitted for a decision based on the memoranda.

## II. FACTUAL BACKGROUND

Born on June 20, 1951, Plaintiff was fifty-four years old on the alleged onset date, and

---

[1] The citations in this Report and Recommendation are to the Administrative Record.

was sixty years old at the time of his final administrative hearing and the ALJ's final decision. R. 595. Plaintiff has a BA in liberal arts, and has past relevant work as a refrigerator repair person. R. 549.

### A. Medical Background

From February 16, 2004 through February 23, 2005, Plaintiff received treatment from the Island Medical Center. R. 291-95.[2] On January 3, 2005, treatment notes indicate that Plaintiff was diagnosed with crack abuse, hypertension, and chronic antibiotic usage,[3] and among other treatment recommendations, the physician stressed that Plaintiff should seek help for his bipolar disorder. R. 292.

Plaintiff was treated by Dr. Gubb at Shore Medical Center from his alleged onset date in August 2005 through September 2006. R. 330-47. On August 18, 2005, Plaintiff's treatment notes indicate that he was addicted to crack, and that he used it to feel better. R. 344. They also indicated that he complained of "leaky gut syndrome," and had hypertension. R. 344. The provider diagnosed Lyme disease and prescribed Metronidazole. R. 343-44. On October 10, 2005, Plaintiff again complained of "leaky gut syndrome," as well as "foggy brain syndrome." R. 340.

On November 10, 2005, Daniel L. Ridout, M.D., of Eastern Shore Physicians and Surgeons, Inc., wrote a letter to Geoffrey Gubb, M.D., regarding Plaintiff's treatment. R. 296. Dr. Ridout noted a marked change in Plaintiff's bowel habits and recommended a colonoscopy. R. 296. He opined that Plaintiff had severe hypertension, and that he must return to taking his hypertension medication. R. 296.

On January 10, 2006, Shore Medical Center recommended a referral to a GI specialist,

---

[2] The copies of the records from this time period are of poor quality, so the Court is unable to read the signature of the physician.
[3] The fourth diagnosis is unreadable.

and diagnosed possible Lyme disease. R. 338. On March 1, 2006, Plaintiff had high blood pressure, and was instructed to stay to see a doctor, but refused. R. 337. Lab results ordered on March 1, 2006, indicated that Plaintiff had an antibody associated with Babesiosis.[4] R. 321. On July 31, 2006, Plaintiff came in for a follow-up appointment. R. 335. Treatment notes indicate that he tried a diet but was constipated, and that he was on a prescription for intestinal yeast. R. 335. The notes also indicate a diagnosis of yeast/Lyme/Babesia. R. 335.

On December 30, 2008, Plaintiff saw Robert F. Coniglio, a certified physician assistant. R. 371. After his examination, PA-C Coniglio assessed congestive heart failure (unspecified), hypertension NOS, cocaine abuse (unspecified), and alcohol abuse (continuous). R. 371-72. On January 2, 2009, Jeanne R. Roll, M.D., followed up on Plaintiff's last appointment. R. 368. She indicated that Plaintiff "voices some interesting opinions about blood pressure, Lyme disease, and 'fluid in his head,'" and assessed him with hypertension, cocaine abuse (continuous), and abnormal blood chemistry (unspecified). R. 368.

PA-C Coniglio saw Plaintiff from February 2011 through October 2011, and assessed hypertension, abnormal blood chemistry (unspecified), cardiomegaly, cocaine abuse (continuous), and a prostate issue. R. 410-17, 422. On September 13, 2011, PA-C Coniglio stated that Plaintiff's Lyme disease and Babesiosis "is cured and treated." R. 422. On October 31, 2011, PA-C Coniglio noted that "given 'leaky gut syndrome' and naltrexone for lyme are both outside my knowledge of traditional medical therapies I agreed that I would look into these before agreeing to do this for him, or refusing to do it. He understands my constraints of working within the realm of accepted standards of medical care." R. 425. PA-C Coniglio also indicated, "[w]e reminded him that the advice he has received previously including stopping

---

[4] Babesiosis is a parasitic disease that can be transmitted by ticks. Center for Disease Control and Prevention, *Parasites – Babesiosis*, http:// www.cdc.gov/parasites/babesiosis/ (last visited Oct. 7, 2014).

smoking, drinking so much beer daily, and using cocaine on occasion is all good medical advice!" R. 425.

B.  **Disability and Function Reports**

On September 16, 2005, Plaintiff filed a disability report.[5] R. 190-97. In the report he stated that he had Lyme disease, and that it made him "stupid and tired." R. 191. He indicated that he was self-employed in refrigeration, a job for which he used tools, wrote reports, and used specialized technical knowledge. R. 192. He also indicated that he walked, stood, sat and stooped for four hours in a workday; climbed, knelt, crouched, crawled and handled both big and small objects for two hours in a workday; and reached for six hours in a workday. R. 192.

On October 15, 2005, Plaintiff also filled out a function report. He indicated that he still worked forty hour workweeks, but during that time only does about ten hours of work. R. 202. He also indicated that he felt better when he tried to work than when he did not. R. 202. He recounted a non-workday in his life as well, in which he indicated that he worked in his garden, cooked, read, and slept for eight hours. R. 203-05. He also indicated that he took care of his girlfriend's cats when she was out of town, and that sometimes he slept or vegetated all day. R. 206. He stated that he cooked and prepared his own meals, did housing repairs and household chores that were "brainless & short," and went outside every day. R. 207-08. He noted that he shopped twice a week for groceries, and "money permitting" he could pay bills, count change, and use a checkbook, though in the comments he indicated that he could no longer balance a checkbook. R. 208. He also indicated that he played in a band twice a month. R. 209. Regarding his social life, he stated that he tried to avoid people, but that he had to see some people for work. R. 209. He noted that he went places "as little as I can," but that he did not

---

[5] Though the report itself is undated, the bottom right corner of every page of the report is dated September 16, 2005.

5

have problems getting along with family, friends, neighbors or others. R. 209-10. He also checked boxes stating he had problems with seeing, memory, completing tasks, concentration, understanding, and following instructions. R. 210. He indicated that he did not finish what he started, he followed written instructions "still ok," and followed spoken instructions "fine, if they're short." R. 210. He also stated that he handled stress "better than everybody." R. 211.

On March 18, 2006, Plaintiff filed a second disability report. R. 213-20. He indicated that he continued to decline, and that he was newly diagnosed with Babesia. R. 213-14, 218. A second function report, filed on June 26, 2007, indicated that Plaintiff continued to care for his girlfriend's cats when she was away, experienced disrupted sleep if he did not work, occasionally "can't be bothered" to take his medicine, cooked his own meals and maintained a vegetable garden, got outside as much as possible, shopped regularly for work supplies and groceries, no longer had energy to maintain his bank accounts, still played in a band that practiced once a week, and handled stress "better than most people." R. 224-31. Plaintiff further stated his condition affected his ability to remember, complete tasks, concentrate, understand, and follow instructions. R. 229.

## C. Physicians' Reports

On November 26, 2005, Richard J. Shea, Ph.D., completed a psychological report for Plaintiff. R. 297-304. In it, he indicated that Plaintiff's intellectual scores were variable, his affect was mildly depressed, and his memory function was low average. R. 298. He noted that Plaintiff was motivated but became more fatigued as the session progressed. R. 298. Plaintiff had an average Full Scale IQ rating, with higher scores in abstract and logical reasoning and expressive vocabulary and fund of knowledge; average scores in numerical reasoning, short-term auditory memory, social judgment and common sense, and ability to mentally organize a

sequence of numbers and letters; and, low scores in ability to assess non-verbal social interactions and determine cause and effect, and short-term memory, attention and concentration. R. 298-99. Plaintiff had variable memory test scores, though they averaged to a low range. R. 300. Dr. Shea indicated that Plaintiff's ability to do the "previous type of work that he has done for 25 years remains intact." R. 301. Plaintiff had low energy, however, and though his ability to relate to others was intact, Dr. Shea indicated that Plaintiff's ability to handle stress may have been decreased by Plaintiff's health issues. R. 301. Dr. Shea diagnosed mental impairments of bipolar disorder, by history; and substance abuse, including crack and a history of marijuana and excessive alcohol use. R. 301. He assessed a GAF of 60-65. R. 302.

David Deaver, Ph.D., performed a psychiatric review of Plaintiff on January 31, 2006. R. 305-319. Dr. Deaver indicated that Plaintiff had medical impairments that were not severe, that could be categorized as affective disorder and substance addiction disorder. R. 305. Dr. Deaver noted Plaintiff was bipolar by history, and had behavioral changes or physical changes due to use of substances. R. 308-13. He checked boxes to note that Plaintiff had mild restrictions of activities of daily living, no difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence and pace, and no repeated episodes of decompensation of extended duration. R. 315.

### D. The Administrative Hearing – March 24, 2009

Plaintiff testified that he lived at his girlfriend's house, and had no other employment than his repair business. R. 549. He stated that his business does not make much money because his energy is very low, and so he works very slowly and sometimes does not have the energy to pursue customers who underpay him. R. 551. He indicated that he no longer kept good records at work, and that sometimes his brain got foggy. R. 553-54. He noted that he has both Lyme

7

disease and Babesia, another tick-borne illness, and the main symptom of his Lyme disease is extreme fatigue. R. 554-55. When asked if he had depression, Plaintiff indicated that he was depressed, and noted that the symptoms of his depression were the same as those for his Lyme disease. R. 557-58. He stated that he had previously seen a psychiatric doctor, but had not been back in five years. R. 558-59. He also noted that his primary care physician diagnosed him as having congestive heart failure. R. 559. In terms of strength, he indicated that he could lift less than he used to, but could still lift thirty pounds, and that he could stand in one place for half an hour without fidgeting and walk for five miles. R. 559-560. In terms of activities, he indicated that he worked for fun, and used to maintain a garden and go on walks but spent less time doing so because he had less energy. R. 563. He indicated that he did not socialize except with his girlfriend, he did not go to church, and that he shopped occasionally. R. 565-66. He indicated that he still cooked, and drank a quart of beer every night. R. 567. He also indicated that he used crack the week prior to the hearing, and that he will buy a twenty dollar piece of crack a couple of times a week, which was "way down" from the amount previously used. R. 568. He also stated that he used the crack as medication to get moving, but that it does not work as well anymore. R. 568-71.

  A vocational expert ("VE") testified that Plaintiff's past work as an appliance repair person was heavy, skilled work. R. 585. The ALJ asked whether jobs would be available for a hypothetical person with the same age, education and work experience as Plaintiff who suffers from Lyme disease, high blood pressure, and a schizoaffective disorder that causes mild fatigue and weakness that is somewhat relieved by medications; who would need simple, routine, unskilled work; who was mildly to moderately limited in his ability to perform "ADL's," interact socially, and maintain concentration, persistence and pace; who could carry twenty-five pounds

8

frequently and fifty[6] on occasion; and, who could stand for six hours, sit for two hours, and have jobs with little interaction with the public, coworkers or supervisors. R. 585-86. The VE testified the jobs of warehouse worker, groundskeeper, and janitor would be available to such a person. R. 587.

### E. The Administrative Hearing – November 22, 2011

At Plaintiff's second hearing, he testified that the last work he had performed was the day before, working on the boiler in a church. R. 596. He indicated that he enjoyed doing work, but made approximately no money in the year prior. R. 596. He also stated that he now had Lubosia, which he had probably had for twenty years, but it was not recognized until six years ago. R. 598. He noted that his blood pressure was "sometimes" controlled by medication, but that he was trying different medications. R. 598-99. He indicated that he had depression secondary to Lyme disease, but claimed it was not clinical depression. R. 602. He claimed he had symptoms such as a foggy brain every day, and that it affected his ability to work daily. R. 603-04. He also stated that he had a house, but that he lived with his girlfriend. R. 604-05. He testified that his legs ached, and that his ability to walk long distance had decreased significantly. R. 605-06. He did not like to sit for very long, preferring to lie down. R. 606. He also was still using crack cocaine "on occasion." R. 606-07. He denied serious injury to his back. R. 609.

A vocational expert ("VE") testified that Plaintiff's past work in HVAC repair and maintenance was skilled and varied in exertion from medium to heavy work, depending on the task. R. 617. The ALJ asked whether jobs would be available for a hypothetical person with the same age, education and work experience as Plaintiff who was suffering from the status-post effects of Lyme disease; has high blood pressure that is fairly well-controlled with medication;

---

[6] The transcript here says fifteen, but the undersigned believes that the correct number is fifty given the provision that the hypothetical individual could carry twenty-five pounds frequently. R. 586.

has some depression with a bipolar component that cases moderate fatigue and weakness and is somewhat relieved by medication without significant side effects; who needs simple, routine, unskilled jobs that are "low stress in nature of concentration in memory" (defined as jobs that require one or two tasks, no fast production rate work, and generally little decision-making or changes in work setting); whose job should require him to interact primarily with things rather than people, with little or no interaction with the public, coworkers, and supervisors; who can lift twenty-five pounds frequently, and fifty[7] on occasion; who can stand for six hours, sit for two hours, and can do some medium work. R. 618. The VE testified the jobs of warehouse worker, groundskeeper, and laundry worker would be available for such a person. R. 618-19. The VE also testified that Plaintiff could not perform his past relevant work. R. 619.

F.    The ALJ's Decision – December 16, 2011

The ALJ found Plaintiff had not been disabled, as defined by the Social Security Act, from the alleged onset date to January 2, 2009, but Plaintiff became disabled on that date and continued to be disabled through the date of decision. R. 42. Plaintiff met the insured status requirement through June 30, 2008. R. 33. At step one of the five-step analysis, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. R. 33. At step two, the ALJ found that Plaintiff had the severe impairments of hypertension and Lyme disease. R. 34. At the third step, the ALJ concluded Plaintiff did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 35.

The ALJ found that prior to January 2, 2009, Plaintiff had the residual functional capacity (RFC) to perform medium work that met the following criteria: simple and unskilled in nature with low stress; requiring low concentration and low memory; consisting of one or two-step

---

[7] *See supra* note 5.

tasks, with no production rate work, and little decision making or changes in the work setting; requiring Plaintiff to deal with things rather than people; and, with little interaction with the public or supervisors.[8] R. 35. Beginning on January 2, 2009, the ALJ found that Plaintiff had the RFC to perform light work, meeting the same criteria as listed above. R. 39-40.

Accordingly, the ALJ found Plaintiff was not capable of performing any of his past relevant work at step four. R. 40. The ALJ found at step five that, prior to January 2, 2009, with Plaintiff's age, education, and residual functional capacity, there were jobs that existed in the national economy he could perform. R. 41. Beginning on January 2, 2009, considering the Plaintiff's age, education, and residual functional capacity, no jobs existed in the national economy that Plaintiff could perform. R. 42.

### III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2012); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to

---

[8] In this assessment, the ALJ references Dr. Shea's report and states that he accepts Dr. Shea's opinion "only to the extent that it is consistent with the residual functional capacity . . ." R. 39. This language appears as boilerplate language in any number of decisions by ALJs throughout the United States regarding the credibility of a plaintiff's statements. *See e.g., Bjornson v. Astrue*, 671 F.3d 640, 644-645 (7th Cir. 2012); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010); *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004). This language is problematic because it implies that an RFC determination was made prior to a determination of Plaintiff's credibility, when the RFC determination should be made with all available evidence, including the credibility determination. *See* 20 C.F.R. § 404.1529(c)(4); *see also Bjornson*, 671 F. 3d at 645 ("A deeper problem is that the assessment of a claimant's ability to work will often . . . depend[] heavily on the credibility of her statements."). However, where, as here, the ALJ properly performed his credibility assessment, remand is not necessary. *See Soghoian v. Colvin*, No. 1:12cv1232, 2014 WL 996530, at *9 (E.D. Va. Mar. 13, 2014) (holding remand is not necessary where "it is clear that the ALJ followed the appropriate two-step process and performed the credibility assessment as part of the overall RFC assessment"); *Racey v. Astrue*, 2013 WL 589223, at *6 (W.D. Va. Feb. 13, 2013) (holding that, despite boilerplate language, ALJ provided sufficient support for his RFC finding and determination of plaintiff's credibility).

support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the [Secretary's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law. *Coffman,* 829 F.2d at 517.

## IV. <u>ANALYSIS</u>

To qualify for SSI and/or DIB, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application, and be under a "disability" as defined in the Social Security Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months. 20 C.F.R. § 404.1505(a) (2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents her from past relevant work, and (5) has an impairment that prevents her from any substantial gainful employment. An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. § 404.1520.

Plaintiff argues that he should be awarded benefits from his alleged onset date of August 25, 2005, and attacks both his physicians' and the social security department's refusal to recognize Plaintiff's alleged condition of chronic Lyme disease. Pl.'s Construed Mot. for Summ. Jmt. (Pl.'s Mot.), ECF No. 12. Plaintiff includes in his pleadings a number of documents, many self-authored, chronicling the condition of chronic Lyme disease and Plaintiff's self-described experience with the disease. ECF Nos. 12, 14, & 20. The information Plaintiff provides is extensive; however, this Court only has the authority to determine whether the ALJ's decision has substantial support from the record. The Court finds that it does.

### 1. The ALJ's decision is Substantially Supported by the Record

First, the ALJ properly assessed Plaintiff's only severe impairments to be hypertension and Lyme disease. R. 34. Plaintiff argues that the ALJ does not properly account for his alleged Herxheimer reaction or chronic inflammation, stating that the symptoms of Lyme disease and the symptoms of Herxheimer's are identical, so evidence of one is "a priori" evidence of the other. Pl.'s Mot. 3. However, the undersigned cannot find an objective medical diagnosis in Plaintiff's medical record of Herxheimer's disease, and Plaintiff does not identify such a record. The ALJ, and the Court, can only make their decisions based on objective medical evidence found in the record. Despite Plaintiff's many self-authored guides to his alleged diseases, the Court cannot overturn the decision of an ALJ without substantial objective medical evidence.

Second, the ALJ properly determined Plaintiff's RFC. R. 35. At this step, the ALJ is required to examine all potential impairments, even those that were not considered to be severe at Step Two. As Defendant notes, Plaintiff's hypertension during that period was generally well-controlled by medication, and an impairment that is generally controlled by medication cannot serve as a basis for disability. Def.'s Mem. in Supp. 16. The ALJ also cited that, giving Plaintiff "every benefit of the doubt," his conditions could cause moderate fatigue and weakness and mild depression. R. 37. However, the ALJ accounted for that when he assessed the Plaintiff's RFC to require simple, routine work with low stress, low concentration and low memory, and work which allows him to work with things rather than people. R. 37.

The ALJ also notes that there is no medical evidence of physical functional limitations or difficulties in sitting, standing, walking, or the physical use of Plaintiff's body. R. 37. He also states that Plaintiff has a history of non-compliance with regard to elevated blood pressure, and that Plaintiff is not currently undergoing any mental health treatment. R. 38. However, Plaintiff

takes most issue with the ALJ's RFC determination as it pertains to Plaintiff's chronic Lyme disease. In his opinion, the ALJ states:

> [t]he diagnosis of Lyme's disease appears to be by history reported to physicians by the claimant and not by any independent, clinical examination or objective findings. In addition, there is no indication that the claimant has been treated for having a positive Babesia antibody. In a progress note dated January 10, 2006, G.W. Gubb., M.D., the claimant's primary care physician, placed a question mark next to the diagnosis of Lyme's disease. . . . Although the claimant reported a constellation of symptoms, there is very little objective evidence to support his complaints.

R. 38. The Court agrees with the ALJ on these points, and on the ALJ's decision to discount Plaintiff's claim of "leaky gut syndrome" because medical records indicated no gastrointestinal disturbance, significant weight loss, or a desire by Plaintiff to seek out a gastroenterologist. R. 38. The Court also notes that Dr. Roll found Plaintiff's opinions on Lyme disease to be "interesting," and PA-C Coniglio doubted the medical sufficiency of some of the treatments Plaintiff was requesting. R. 368, 425. PA-C Coniglio also referred to Plaintiff's Lyme disease and Babesiosis as "cured and treated." R. 422. Again, though Plaintiff has provided the Court with many documents detailing how he believes his alleged chronic Lyme disease and "leaky gut syndrome" affects him in daily life, none of them can be considered objective medical evidence due to Plaintiff's lack of medical training and lack of objectivity. Because the objective medical evidence does not support Plaintiff's claim that chronic Lyme disease and "leaky gut syndrome" rendered Plaintiff disabled from August 25, 2005 through January 1, 2009, the Court finds substantial evidence in the record to support the ALJ's decision.

Finally, the ALJ met his burden to prove that there were jobs in the national economy that Plaintiff could have performed prior to January 2, 2009. Plaintiff argues somewhat understandably that the jobs the VE suggested for Plaintiff do not really exist in the national economy any longer. Pl.'s Mot. 5-6. Plaintiff argues that groundskeeper is a seasonal

occupation, warehouse worker and laundry worker do not exist anymore as positions because local laundries have dwindled and salespeople do their own warehouse staffing, and that janitor positions do not exist because the positions are now contracted. *Id*. However, the VE and ALJ do not need to prove that there are local positions that would have been available at the time Plaintiff could have been engaging in substantial gainful activity, that there is a specific position open to Plaintiff, or that Plaintiff would be given the position if he applied; they simply need to prove that those positions existed in the national economy during the period at issue. 20 C.F.R. §§ 404.1566, 416.966. The ALJ and VE met the burden to prove that there were positions in the national economy that Plaintiff could have performed during the relevant period.

### 2. Plaintiff's Additional Materials Should Not Be Considered

Plaintiff requests a remand so that additional material submitted to the Appeals Council could be considered. This Court will not remand the case back to the Commissioner for an examination of the new evidence. Sentence six of 42 U.S.C. § 405(g) allows that "[t]he court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ." 42 U.S.C. § 405(g) (2012). Based on this, any evidence to warrant a remand must be new, material, and have good cause for why it was not previously presented to the Social Security Agency. *See Shalala v. Schaefer*, 509 U.S. 292, 297 n.2 (1993). For remand under sentence six of 20 U.S.C. § 405(g), "evidence is considered new if it is not duplicative or cumulative and is material if there is a reasonable possibility that the new evidence would have changed the outcome." *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011)(quoting *Wilkins v. Secretary, Dept. of Health and Human Services*, 953 F.2d 93, 96 (4th Cir. 1991))(quotation marks omitted).

Defendant properly states that "none of the Appeals Counsel evidence is 'material.'" Def.'s Mem. in Supp. 21. Specifically, Plaintiff's 2012 MRI showing white matter changes to his brain is not material, because it was conducted four years after the date from which the ALJ awarded benefits. Its readings offer little insight into the state of Plaintiff's brain during the period for which he is attempting to receive benefits, from 2005 to 2009. This and Plaintiff's other submitted evidence are not material because the ALJ would not have changed his decision even if he had considered it. Because of this, Plaintiff's request for a remand to consider additional material should be DENIED.

## V. RECOMMENDATION

For the foregoing reasons, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 12) be DENIED; the Commissioner's Motion for Summary Judgment (ECF No. 15) be GRANTED; the final decision of the Commissioner be AFFIRMED.

## VI. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/
Tommy E. Miller
United States Magistrate Judge

Norfolk, Virginia
October 7, 2014